```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TENNESSEE
                    WESTERN DIVISION
```
_____

```
UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
vs.                            )
                               )        Cr. No. 06-20062-MlV
                               )
LARRY AMMONS,                  )
                               )
          Defendant.           )
```
_____

REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS
_____

The defendant, Larry Ammons, was indicted on five counts of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).   The indictment charges Ammons with possession of five different firearms, including a Ruger model New Single Six .22 revolver, a Taurus model PT99AF 9mm pistol, a Remington model Speed Master 552 .22 caliber rifle, a Smith & Wesson model 13-2 .357 revolver, and a Charter Arms model Undercover .38 Special revolver.

Presently before the court is Ammons' July 26, 2007 motion to suppress all evidence seized by law enforcement officials during two warrantless searches.   The first search took place on January 10, 2006, at 131 Wheatley Drive in Newbern, Tennessee, while the second search involved a traffic stop of Ammons' vehicle on January 18, 2006.   Ammons claims

both searches were conducted in violation of his rights under the Fourth Amendment. The motion was referred to the United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. 636(b)(1)(B)-(C).

Pursuant to the referral, an evidentiary hearing was held on October 17, 2007. At the hearing, the government presented six witnesses: Sergeant Steve Everett of the Newbern Police Department, Officer Heath Walker of the Dyer County Sheriff's Department, Investigator Joe Moody of the Dyer County Sheriff's Department, Robert Shanklin, Special Agent Nathan Bishop of the Tennessee Bureau of Investigation, and Captain Larry Bell of the Dyer County Sheriff's Department. The defendant did not adduce any testimony. The government also introduced five exhibits: a list of weapons reported stolen or missing by Judy Shanklin (Ex. 1), a list of property pawned by Ammons (Ex. 2), a Waiver of Rights form signed by Ammons (Ex. 3), a photograph of the revolver found in Ammons' vehicle (Ex. 4), and a list of items seized from Ammons' vehicle (Ex. 5).

After careful consideration of the statements of counsel, the testimony of the witnesses, the exhibits, and the entire record in this cause, this court submits the following findings of fact and conclusions of law and recommends that the motion to suppress be denied.

2

PROPOSED FINDINGS OF FACT

On January 10, 2006, at approximately 5:30 a.m., the Newbern Police Department received a telephone call reporting the recovery of stolen items at a residence located at 131 Wheatley Drive North, Newbern, Tennessee.  Sergeant Steve Everett was dispatched to the location, which consisted of a single-family house with a camper trailer parked in the driveway.  Sergeant Everett testified that Ammons and two brothers, Robert and Billy Shanklin, were present at the time Sergeant Everett arrived at the residence.  When the Shanklin brothers told Sergeant Everett that Ammons had taken valuable coins and other items from the residence of their mother, Judy Shanklin, located outside city lines on Sorrells Chappell Road, Sergeant Everett informed the brothers he must turn over the case to the Dyer County Sheriff's Department. When the Dyer County Sheriff's Department Officer arrived, Sergeant Everett merely stood by and did not participate in any subsequent search or investigation.  Sergeant Everett stated under oath that he never requested the Shanklin brothers to search the house nor did he advise them to continue their search.

It is unclear whether Ammons was a co-owner of the residence or whether he was living in the residence. Sergeant

3

Everett testified that Ammons never told him that he lived in the residence.  Sergeant Everett did notice while walking through the residence that although it contained furniture and at least one bed, there was no electricity in the house. Ammons did have permission from the owner of the residence, Judy Shanklin, to reside in the camper trailer parked in the driveway while he performed remodeling work inside the house. Ammons and Judy Shanklin were romantically involved in the past, but the relationship had ended a few months prior to this incident.

The second witness to testify was Deputy Sheriff Heath Walker of the Dyer County Sheriff's Department. Upon arrival, Deputy Walker was met by the Shanklin brothers, Ammons, and Sergeant Everett.  He testified that the Shanklin brothers informed him that their mother owned the residence located at 131 Wheatley Drive and that Ammons had been permitted to live in the camper trailer located in the driveway while he remodeled the house.  According to Deputy Walker, Ammons never disputed these statements and never told Deputy Walker he did not want him to enter the residence.

Deputy Walker was shown the coins that Robert Shanklin had found in a desk located in the living room. When the brothers' mother, Judy Shanklin, arrived, she asked Deputy

4

Walker to search the house in an effort to recover additional property she suspected was stolen by Ammons from her primary residence, in particular, some tools she had bought that were missing.  Deputy Walker searched the house at her request. Deputy Walker also testified that his search included garbage cans on the outside of the house and a vehicle which he believed was owned by Judy Shanklin and had been given to Ammons to use.  Ammons admitted to having Judy Shanklin's pool stick in the vehicle and consented to the search of the vehicle, which did in fact yield the pool stick.  No evidence, however, was found in the garbage cans. Like Sergeant Everett, Deputy Walker did not recall any lights being on in the house. He specifically remembered using a flashlight inside the house.

Either before Deputy Walker began searching the house or shortly after he began doing so, it was decided that, due to the heated situation, it was in Ammons' best interest not to be present and that he would be given a courtesy transport to Dyersburg. Ammons agreed to leave the house.  After Ammons departed the scene with another officer, a plastic Walmart bag was found in the living room under a blanket containing two to three scopes, binoculars, and duck calls. When one of the brothers claimed the bag and its contents as his property,

5

Deputy Walker contacted Investigator Joe Moody and then notified the transporting officer that Ammons was to be taken to the jail instead.

The third witness to testify was Investigator Joe Moody of the Dyer County Sheriff's Department. Investigator Moody testified that around 10:00 a.m. that same morning, Judy Shanklin brought pawn tickets to his office that she found in her bedroom of the house on Sorrells Chappell Road. At this point, Judy Shanklin gave him a list of stolen or missing weapons. *See* Pl.'s Ex. 1. Upon speaking with Ammons, Investigator Moody testified that Ammons executed a waiver of his rights, *see* Pl.'s Ex. 3, and thereafter made a statement that Judy Shanklin had been paying him to remodel the 131 Wheatley Drive residence.

On January 13, 2006, Investigator Moody went to Alamo Pawnshop to see what property the tickets represented. The property consisted of tools and guns, including a Remington model Speed Master 552 .22 caliber rifle, a Ruger model New Six .22 revolver, and a Taurus model PT99AF 9mm pistol. From this information, Investigator Moody compiled a list of property pawned by Ammons. *See* Pl.'s Ex. 2. Additionally, the pawn shop owner identified Ammons from a photo line-up as the person who pawned the property.

6

Next to testify was Robert Shanklin, one of the brothers who initiated the search at 131 Wheatley Drive. Robert Shanklin testified that his brother, Billy Shanklin, had driven Ammons to the residence at 131 Wheatley after having found Ammons hiding behind a shed at Judy Shanklin's house on Sorrels Chappell Road. After Billy Shanklin returned to his mother's house, the brothers decided to go back to the Wheatley Drive residence in order to conduct a search for stolen property. As the brothers were using their mother's key to turn the doorknob at the Wheatley Drive residence, Ammons opened the front door. While Billy Shanklin spoke to Ammons, Robert Shanklin walked through the house. After finding the coins in a desk drawer, Robert Shanklin notified his mother and sister by phone, and one of them then called for police assistance. Robert Shanklin testified that his mother arrived before the second officer. Once the police arrived, the police were asked to search the house. Robert Shanklin testified that no police officers asked him to conduct a search of the house.

Robert Shanklin testified that after the coins had been discovered, but before the plastic bag had been found, it was decided that Ammons would be driven to a rest stop by one of the officers. Robert Shanklin testified that he kicked over

7

the sofa in anger, thereby revealing the plastic bag with the scopes, binoculars, and duck calls. After the bag was found, Ammons was arrested and his destination was changed to the jail. Robert Shanklin was not sure when the pawn tickets were found.

The fifth witness to testify was Special Agent Nathan Bishop of the Tennessee Bureau of Investigation, who testified about the January 18, 2006 traffic stop and search of Ammons. Agent Bishop testified that he had received information from Special Agent John Mayer on January 17, 2006, that a reliable confidential informant had predicted that Ammons would be in the Dyersburg area the next day attempting to sell a stolen tractor. In order to check the confidential informant's tip, Agent Bishop called the Dyersburg County Sheriff's Department and Attorney General Gibbons to see if they had any information on Ammons. The Sheriff's Department advised Agent Bishop that Ammons was out on bond on a theft charge. In addition, Agent Bishop testified that Attorney General Gibbons then contacted a parole officer and advised him of this fact. As a result of his conversation with Attorney General Gibbons, it was Agent Bishop's understanding that a parole warrant would be issued.

Agent Bishop then spoke with the confidential informant,

8

who advised him that Ammons planned to sell a stolen tractor to raise money for a quick move to Florida. In addition, the informant stated that Ammons had been armed with a gun, located in the small of his back, during a previous meeting between the two of them and that Ammons would be driving an extended cab truck pulling the stolen tractor into Lauderdale County on January 18, 2006. Agent Bishop then advised Captain Bell of the Dyer County Sheriff's Department of this information.

On January 18, 2006, Agent Bishop was driving on Route 51 when he saw Ammons driving the suspect vehicle south, toward Lauderdale County, with a tractor on the attached trailer. Because the vehicle and driver met the description given by the confidential informant and the vehicle was pulling the tractor described by the informant in the direction described and at the time of day predicted by the informant, Agent Bishop attempted to stop the vehicle through activation of his emergency lights. This effort, however, was unsuccessful. Captain Bell caught up to the vehicles and eventually pulled over Ammons' vehicle about 1.5 miles past the county line.

According to Agent Bishop, Ammons exited the car immediately. A patdown was done once Ammons got out of the vehicle, but no weapon was found on Ammons. Ammons was placed

9

in a patrol vehicle after the patdown. Agent Bishop testified that he looked in the window on the driver's side and saw a pistol box in the truck's console and a revolver in a holster on top of the console.  Tools and guns were recovered from Ammons' vehicle.

Last to testify was Captain Larry Bell of the Dyer County Sheriff's Department. He also testified about the traffic stop on January 18, 2006.  Captain Bell, who was familiar with Ammons' status as a prior convicted felon before this incident, had been informed of the underlying facts by Agent Bishop. Captain Bell had just pulled into an intersection at Four Points when Agent Bishop radioed stating the suspect vehicle had been spotted at a point halfway between Four Points and the county line. Captain Bell caught up with Agent Bishop's vehicle and was then able to pull over Ammons' vehicle at the county line. Ammons was ordered out of the vehicle, handcuffed, and placed in a squad car because Captain Bell believed that an active patrol warrant had been issued[1] and had knowledge that Ammons was a previously convicted and

_____

[1] A violation of parole warrant had been applied for at this point, but was not issued until days later. Captain Bell testified that he was under the impression that the warrant had been issued at the time of the stop. Only after the incident did he discover the warrant had not yet been issued.

presently-armed felon. Captain Bell then walked up to the vehicle to see if it contained any passengers. Although Captain Bell did not see any passengers, he was able to see a pistol box within plain view on the back floorboard and the handle of a chrome-plated revolver.

After arresting Ammons and advising him of his *Miranda* rights, Captain Bell asked Ammons where the tractor and trailer came from. Ammons replied that the tractor, trailer, and guns came from Gary Ray, who did not know they were missing. Captain Bell checked a computer database, but the tractor had not been reported stolen. At this point, Investigator Moody contacted Ray, who was able to confirm that his property was indeed missing.

This court finds the testimony of all the law enforcement officers to be fully credible. On all relevant matters essential to the Fourth Amendment issues herein, the law enforcement officers corroborated each other's testimony and such testimony was believable. Only one detail varied amongst the witnesses: Robert Shanklin testified that his mother arrived <u>before</u> Deputy Walker, but both Sergeant Everett and Deputy Walker maintained Judy Shanklin arrived sometime <u>after</u> Deputy Walker responded to the Wheatley Drive residence. Because the law enforcement witnesses corroborated one another

and because their testimony does not contradict that of Robert Shanklin's on any other point, the court submits that the discrepancy as to when Judy Shanklin arrived is not germane to the suppression analysis, and the officers' testimony and that of Robert Shanklin should be accepted as fact insofar as it pertains to the events which led to the seizure of the weapons at the Wheatley Drive house.

In addition, the testimony of all the witnesses remains unrebutted. Ammons called no witnesses nor was the testimony of any witness impeached. Accordingly, the court finds as fact that the seizure of the weapons occurred as described by the testimony of the witnesses and set forth herein.

PROPOSED CONCLUSIONS OF LAW

As an initial matter at the hearing, the government raised a question as to the standing of Ammons to challenge the search of the Wheatley Drive house. During the course of the hearing, the government did not pursue the issue of standing. Therefore, for purposes of this opinion, the court assumes that Ammons has standing without making any finding as to standing.

Ammons' motion to suppress is actually two motions in one: a motion to suppress evidence found as a result of a warrantless search of the 131 Wheatley Drive residence and a

12

motion to suppress evidence found within Ammons' vehicle during an unrelated traffic stop. The motion concerning the search of the residence raises two issues: 1) whether the search was a private search or a government search and, if deemed to be a governmental search, whether it was a valid search based on consent, and 2) whether the pawn tickets given to Investigator Moody hours after the search took place were the fruit of an illegal search. The motion concerning the traffic stop also raises two issues: 1) whether the officers' stop and detention of Ammons' vehicle was based on reasonable suspicion that criminal activity was afoot and 2) whether the warrantless search of the vehicle was valid pursuant to the plain view and automobile exceptions to the search warrant requirement.

A.   <u>The Search of the House</u>

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. This amendment exists to ensure the inviolability of an individual's home. *See United States v. Nelson*, 459 F.2d 884, 885 (6th Cir. 1972). The Supreme Court has long recognized

13

the age-old adage that "[a] man's home is *his* castle," and that specifically, such a right to be secure from intrusion in that castle is embodied in the Fourth Amendment. *Minnesota v. Carter,* 525 U.S. 83, 94 (1998)(Scalia, J., concurring)(internal quotations omitted). Mr. Justice Stewart stated in his opinion for the Court in *Coolidge v. New Hampshire*:

> [T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions.' The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.' '[T]he burden is on those seeking the exemption to show the need for it.'

*Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971)(footnotes omitted). The Supreme Court clearly stated in *Payton v. New York* that:

> In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

*Payton v. New York*, 445 U.S. 573, 590 (1980)

1. *Governmental Search v. Private Search*

The Fourth Amendment's protection against unreasonable

14

searches and seizures extends only to governmental searches. The Supreme Court has held that the Fourth Amendment's protection is "wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." *United States v. Jacobsen*, 466 U.S. 109, 113-14 (1984)(internal quotations and citation omitted).

The Sixth Circuit has stated that an individual conducting a search will not be considered a police agent simply because there was some antecedent contact between the individual and a police officer. *See United States v. Coleman*, 628 F.2d 961, 965 (6th Cir. 1980). Instead, the Sixth Circuit has recognized that two of the critical factors in the agent analysis are: "(1) the government's knowledge or acquiescence, and (2) the intent of the party performing the search." *United States v. Howard*, 752 F.2d 220, 227 (6th Cir. 1985).

In this case, the government argues that the search of the Wheatley residence was strictly a private search. The court finds this argument to fail. Deputy Walker admitted in court that he performed a search of the Wheatley house at the request of Judy Shanklin, and the court has found as fact that

15

Deputy Walker searched the Wheatley house.  Thus, there is no question that the government participated in the search.

This was a situation where a private search was converted into a governmental search. Robert Shanklin testified that he and his brother went to the Wheatley house in order to search for property they suspected Ammons had stolen from their mother. The Shanklin brothers had no contact with police prior to their search of the house.  After they found stolen coins in a desk drawer, Robert Shanklin testified that he telephoned his mother and sister to report the finding, and then either his mother or sister called for police assistance.

The first officer to arrive, Newbern Police Department Sergeant Steve Everett, testified that he did not search the house, ask the Shanklin brothers to search the house, or take any action because he determined the matter to be outside his jurisdiction and called for assistance from the Dyer County Sheriff's Department. A short time later, Deputy Walker and Judy Shanklin arrived. The testimony is undisputed that Deputy Walker did not request the Shanklins to conduct a search. Further, the testimony is undisputed that once Judy Shanklin arrived, she requested the police to search the house to recover additional stolen property. Because the police did proceed to search the house for stolen goods, the earlier

16

private search became a governmental search.  Therefore, the search of the Wheatley house was at least in part a governmental search to which the Fourth Amendment's protections are applicable.

### 2.  *Consensual Search*

In order to justify the warrantless searching of the house where Ammons had a rightful expectation of privacy, the government must show that one of the exceptions to the warrant requirement applies.  A consensual search is an exception to the Fourth Amendment's implied proscription against warrantless searches.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  "An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search."  *United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996).  When the validity of a warrantless search is based on consent, the government has the "burden of proving that the necessary consent . . . was freely and voluntarily given."  *Florida v. Royer*, 460 U.S. 491, 497 (1983).  Consent to search only vitiates the warrant requirement if the consent was voluntarily given.  *Id*.  Accordingly, a necessary element of the government's case is to show that consent was voluntary.

Here, there is no dispute that Judy Shanklin voluntarily

consented to a search of the Wheatley residence. Judy Shanklin had been notified by her son that stolen property had been recovered from within the residence. She immediately called for police assistance and met the police at the house. Because she suspected Ammons had taken a number of items from her primary residence, she asked the police to continue the search her sons had begun. The court finds the testimony of the two responding law enforcement officers to be credible. Both officers witnessed Shanklin's request for a police search, and this testimony also matches that of Shanklin's son, who asserted that his mother both called for police assistance and requested a police search. Because the court finds Judy Shanklin's consent to search was voluntary, suppression of items recovered from areas over which Judy Shanklin had consent authority would not be proper. Suppression of items recovered from areas over which Judy Shanklin did not have authority to consent to a search would be proper. In this case, no such areas exist.

    3.  *Judy Shanklin's Authority to Consent to a Search*

    Consent to search can be provided by "a third party who possesse[s] common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171

18

(1974).  Common authority is

> mutual use of the property by persons generally
> having joint access or control for most purposes,
> so that it is reasonable to recognize that any of
> the co-inhabitants has the right to permit the
> inspection in his own right and that the others
> have assumed the risk that one of their number
> might permit the common area to be searched.

*Id.* at 171 n.7.

At the time of the search, Judy Shanklin was an owner of the residence at 131 Wheatley Drive. It is unclear as to whether Ammons held an ownership interest in the house; however, no witnesses testified that Ammons lived in the house, and Ammons did not elect to testify. Because Judy Shanklin was a co-owner of the residence, if not the sole owner, she had the right to permit entry by individuals of her choosing.  Thus, Judy Shanklin had the requisite authority to provide the police with consent to search the entire house and property. Therefore, the search was valid.

4.  *The Pawn Tickets*

Ammons argues in his motion that the pawn tickets recovered hours later that morning by Judy Shanklin from a separate residence and given to Investigator Moody in an effort to recover her stolen property is fruit of the poisonous tree. There was, however, no testimony that the government in any way directed Judy Shanklin to look for

the pawn tickets.  The tickets were found hours after the search in an entirely separate residence located fifteen or twenty minutes away from the Wheatley Drive residence. There was no witness testimony that the police had been instructed to look specifically for the pawn tickets during the earlier search; rather, it appears as though the police and the Shanklins sought to recover tools, guns, and a pool stick.  Therefore, because the discovery of the pawn tickets is wholly unrelated to the earlier search of the house by police, the tickets are not considered fruit of the poisonous tree.  Even if the pawn tickets were related to the earlier search, they would not be considered fruit of the poisonous tree because the earlier search was valid based on consent, as discussed above.

Accordingly, there is no legitimate basis for suppressing the guns that were discovered from the evidence of the pawn tickets.

B.   <u>Search of the Vehicle</u>

Because this was a warrantless search of a vehicle, the government has the burden of proof.  6 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 11.2(b) (4th ed. 2007).  A warrantless search is per se unreasonable except for a few well-defined exceptions.

*Katz v. United States*, 389 U.S. 347, 357 (1967).  Among these exceptions are patdown searches in connection with an investigative stop, *Terry v. Ohio*, 392 U.S. 1, 30 (1968); searches for evidence in plain view of an officer who is justified in being where he is, *Coolidge v. New Hampshire*, 403 U.S. 443, 465-72 (1971); and searches of automobiles for which probable cause exists that contraband is contained therein, *United States v. Ross*, 456 U.S. 798, 799-800 (1982).

In this case, the stop and detention of Ammons fits within the parameters of *Terry v. Ohio.*  When a police officer observes unusual conduct or is aware of facts which leads him to reasonably conclude in light of his experience that criminal activity may be afoot, he may briefly stop the suspicious person and make reasonable inquiries aimed at confirming or dispelling his suspicions.  *Terry*, 392 U.S. at 30.

Once it is determined that there has been a *Terry* stop, the court must determine whether the detention was "reasonable."  The government must show (1) that the seizure was based on "reasonable suspicion" of criminal activity, and (2) that the investigative measures used were the least intrusive means reasonably available to dispel the officer's suspicion in a short period of time.  *United States v.*

21

*Fountain*, 2 F.3d 656, 663 (6th Cir.), *cert. denied*, 510 U.S. 1014, 11 S. Ct. 608 (1993), *rev'd on other grounds*.  Further, when an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or others, he may conduct a patdown search to determine whether the person is in fact carrying a weapon.  *Terry*, 392 U.S. at 24.  Such protective searches must be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.  *Id.* at 26.

In the present case, the government submits that the stop and questioning of Ammons was reasonable under *Terry* because police had a reasonable suspicion based on  information received from the informant which was independently verified by the officers' personal observations and knowledge.  Agent Bishop had received detailed information from the informant as to the description of both Ammons himself and the vehicle Ammons would be driving, the fact Ammons had been armed at a previous meeting and would likely be armed during the drive, the direction he would be traveling in, the description of the type of tractor that the vehicle would be towing, and the date and time he would be traveling.  Though Agent Bishop had received this information through a colleague, Agent Mayer, he

22

personally spoke to the confidential informant on January 17, 2006 and January 18, 2006 to verify all details.  On January 18, the descriptions of the vehicle, driver, and tractor were independently verified by Agent Bishop's personal observation of the GM truck on Highway 51 on the date and time predicted by the informant. The officers also had a good faith belief that a parole warrant had been issued for Ammons' arrest. Ammons' vehicle was pursued and eventually stopped, at which time Ammons was handcuffed due to the parole violation as well as the officers' belief that Ammons was a presently armed, previously convicted felon.

Both Agent Bishop and Captain Bell were credible witnesses who personally conducted the stop of Ammons. They not only corroborated the informant's tip, but they also had knowledge of Ammons' status as a previously convicted felon whom they suspected was armed. Furthermore, Agent Bishop testified that the confidential informant had provided reliable information in the past. Under the totality of circumstances - the information from the informant verified in part by the personal observations of the officers, the knowledge of Ammons' status as a previously convicted felon, as well as the belief that an active parole warrant had been issued as of the date of the stop - sufficient reasonable

23

suspicion existed to believe Ammons had committed a crime and to warrant the stop of Ammons' vehicle and his detention.

Finally, the search of the defendant's vehicle was reasonable under the "plain view" exception. Captain Bell testified that after securing Ammons in handcuffs, he approached the vehicle in order to check for additional passengers. Through the back window of the truck, Captain Bell observed a pistol box and a chrome-plated revolver on the back floorboard of the vehicle. It is not unconstitutional for a police officer to look inside an automobile. *Texas v. Brown*, 460 U.S. 730, 739-40 (1983). The officer was justified in approaching the vehicle as part of the protective search pursuant to the *Terry* stop.

Upon seeing the gun, it was not unreasonable for Captain Bell to seize the gun. The warrantless seizure of evidence of a crime in plain view does not violate the Fourth Amendment if its incriminating character is "immediately apparent." *United States v. Weatherspoon*, 82 F.3d 697, 699 (6th Cir. 1996)(*quoting Horton v. California*, 496 U.S. 128, 130 (1990)).

The question then is whether the gun was evidence of a crime that was immediately apparent to the officers. This issue is easily resolved. Section 39-17-1307 of the Tennessee Code Annotated makes it an offense to carry a firearm with the

24

intent to go armed. To be guilty of this violation, it is immaterial whether the firearm is loaded or not. *Brooks v. State*, 215 S.W.2d 785, 787 (Tenn. 1948). In addition, Captain Bell understood that Ammons was a previously convicted felon and, pursuant to 18 U.S.C. § 922(g), was not permitted to possess a firearm. It was readily apparent to Captain Bell that the defendant intended to be armed, which is a crime, and the gun was evidence of that crime. As a consequence, it was reasonable for him to seize the weapon.

Finally, it is noted that the officers could also justify their seizure of the weapon under the automobile exception to the search warrant. The automobile exception allows a warrantless search of a vehicle if the car is readily mobile and probable cause exists to believe it contains contraband. *Maryland v. Dyson*, 527 U.S. 465, 467 (1999). Here, the officers had received information from a reliable informant that Ammons would be armed during the drive. In addition, the officers knew Ammons to be a previously convicted felon. Therefore, when no weapon was found on Ammons' person, the officers had probable cause to believe the car contained contraband, and, as such, the search of the vehicle was valid. Accordingly, it is submitted that the seizure of firearms from Ammons' vehicle did not violate the Fourth Amendment.

RECOMMENDATION

For the foregoing reasons, it is recommended that Ammons'

motion to suppress be denied in its entirety.


       s/Diane K. Vescovo       
DIANE K. VESCOVO
UNITED STATES MAGISTRATE JUDGE
DATE: November 5, 2007      


NOTICE

ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED
WITHIN TEN (10) DAYS AFTER BEING SERVED WITH A COPY OF THE
REPORT.   28 U.S.C. § 636(b)(1)(C).   FAILURE TO FILE THEM
WITHIN TEN (10) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS,
EXCEPTIONS, AND FURTHER APPEAL.

ANY PARTY OBJECTING TO THIS REPORT MUST MAKE ARRANGEMENTS
FOR A TRANSCRIPT OF THE HEARING TO BE PREPARED.