IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TENNESSEE
                          WESTERN DIVISION

_____

UNITED STATES OF AMERICA,      )
                               )
     Plaintiff,                )
                               )
vs.                            )       No. 06-20062-MlV
                               )
                               )
LARRY AMMONS,                  )
                               )
     Defendant.                )

_____

                SUPPLEMENTAL REPORT AND RECOMMENDATION
                   ON DEFENDANT'S MOTION TO SUPPRESS

_____

     The defendant, Larry Ammons, was indicted on five counts of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The indictment charges Ammons with possession of five different firearms: a Ruger model New Single Six .22 revolver; a Taurus model PT99AF 9mm pistol; a Remington model Speed Master 552 .22 caliber rifle; a Smith & Wesson model 13-2 .357 revolver; and a Charter Arms model Undercover .38 Special revolver.

     Presently before the court is Ammons' July 26, 2007 motion to suppress all evidence seized by law enforcement officials during two warrantless searches. The first search took place on January 10, 2006, at 131 Wheatley Drive in Newbern, Tennessee, while the second search involved a traffic stop of Ammons' vehicle on January 18, 2006. Ammons claims both searches were conducted in violation of his rights under the Fourth Amendment. The motion was referred

to the United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. 636(b)(1)(B)-(C).

Pursuant to the referral, an evidentiary hearing was held on October 17, 2007. This court heard testimony from six different witnesses, received five evidentiary exhibits, and subsequently entered a report and recommendation that Ammons' motion to suppress be denied. (*See* Report and Recommendation, Doc. No. 55, Nov. 5, 2007.) Ammons then filed a motion for reconsideration on November 15, 2007, seeking to re-open the proof so that Judy Shanklin could testify about her knowledge of the search at 131 Wheatley Drive. This court granted Ammons motion in order to allow the testimony of Judy Shanklin. (*See* Order Granting Mot. for Recons., Doc. No. 62, Nov. 30, 2007.)

Pursuant to the November 30, 2007 order, a second evidentiary hearing was held on January 11, 2008. At the hearing, Ammons presented his witness, Judy Shanklin. The government did not present any additional witnesses or evidence. Ammons also introduced two additional exhibits consisting of eight marked pawn tickets (collective Ex. 6) and a utility bill for the 131 Wheatley Drive house addressed to Larry Ammons (Ex. 7).

After careful consideration of the statements of counsel, the new testimony from Judy Shanklin, the two additional exhibits, the testimony and exhibits from the initial evidentiary hearing, and the entire record in this case, this court submits the following

findings of fact and conclusions of law and recommends that the motion to suppress be denied.

PROPOSED FINDINGS OF FACT

During the second evidentiary hearing, Judy Shanklin testified about the events that occurred on January 10, 2006, and other relevant background information. She stated that she lives at her home on Sorrels Chapel Road, but she purchased the 131 Wheatley Drive house from Ammons for $11,000 in November of 2005 and received a warranty deed. Ammons continued living at 131 Wheatley since that time pursuant to an agreement between himself and Ms. Shanklin that Ammons would complete renovations and improvements on the house while living there. She also stated that Ammons sold her the house as part of an agreement between the two that Ms. Shanklin would procure a loan in order for them to open a coffee house. Ammons did not have sufficient credit to get the loan, so he was supposed to make the loan payments, with the agreement providing that if he failed to make the payments, she would get to keep the house. Ms. Shanklin stated that there was no formal document evidencing the agreement, but she had "scribble papers," which they had both signed, setting out the terms. Ammons never made any payments on the loan because she did not get it until March of 2006.

Ms. Shanklin testified that the water and electricity were turned on at the 131 Wheatley house and Ammons was responsible for

paying those bills, which were in his name. The bills were mailed to her P.O. box to which she had given Ammons access. She mentioned that she would often go over to inspect the work that Ammons was doing and to do some tasks on her own. Ammons had previously lived at her house on Sorrells Chapel Road for a short period of time while the roof was leaking at the 131 Wheatley house, but as of October 2005 he had moved back to the Wheatley house. Ammons, however, retained a key to the house on Sorrells Chapel. Ms. Shanklin owned a camper trailer and a truck that she allowed Ammons to use. The camper had been at the Wheatley house for some time, and she had requested that Ammons return it to her house so that it would be covered under her insurance.

Regarding the events that took place on January 10, 2006, Ms. Shanklin testified that she remembered going over to the Wheatley house in the middle of the night, but she did not remember what day or time of year it was. She specifically stated that she knew it was cold and thought that it may have been in the fall. She stated that the Wheatley house was livable, but it still needed a lot of work.

On the night in question, Ammons had come over to Ms. Shanklin's house on Sorrells Chapel because she had asked him to return the camper, but he had not brought it with him. Frustrated with the absence of the camper, the lack of progress on the work at the Wheatley house, and the fact that her tools, which Ammons was

4

using, failed to be returned when he finished working each day, she asked one of her sons to drive Ammons back over to the Wheatley house in her truck. As a result this frustration, she stated that she had intended to terminate Ammons' services. After dropping Ammons off, her son discovered the "special" pool sticks in the back of the truck Ammons had been using and asked his mother what they were doing there. Ms. Shanklin said that she did not know, and she told her son to go back over to the Wheatley house to ask Ammons why the pool sticks were in the back of the truck. It was after her son returned to the Wheatley house and called her telling her to come over that she finally arrived at the house.

There were no utilities on at the Wheatley house when she arrived that night. The utilities at the Wheatley house had been cut off because Ammons had failed to pay the electric bill, but Ms. Shanklin did not know how long they had been cut off. She testified that when she arrived at the Wheatley house, her sons and the police were already on the scene, and they were searching the house using flashlights. She later helped them to search the house herself. She testified that, to her knowledge, the police did not ask her son to search the house. She stated that she was shown some old coins that were found at the house, but she said she never came in contact with any pawn shop tickets. Ms. Shanklin further testified that the pool sticks found in the truck were supposed to be in her house, but she did not expect the old coins found at the

5

Wheatley house to be hers, although they were hers. The police left the scene, and her son, Billy, was the last one to remain at the Wheatley house. Billy stated that he was going to continue to look around, and she acquiesced. Later that morning, Billy returned the truck to Ms. Shanklin's house and showed her some pawn tickets that he had found. The pawn tickets were for tools and coins, among other things. Ms. Shanklin stated that she could not believe it when she saw the tickets. She said that she recognized the items on the tickets by description and that they were hers. She testified that Billy had found the pawn tickets, and he would not tell her where he found them, other than that they were at the Wheatley house.

The following day, Ms. Shanklin took the pawn tickets to the police station. She spoke with Investigator Joe Moody in an effort to try and figure out what was going on. Up until the time she first saw the pawn tickets, she had no idea that anything of hers was missing. Ms. Shanklin identified 8 different pawn tickets that described items of hers. *See* Def.'s Ex. 6. None of the tickets she identified, however, had anything to do with firearms. The address on each pawn ticket was that of the 131 Wheatley house.

When asked questions on cross examination about her relationship with Ammons, Ms. Shanklin testified that she had given Ammons $5,000 in order to retain counsel in this matter. She also stated that she periodically sends Ammons money for his sister.

She acknowledged that the old coins found at the Wheatley house were part of her collection and that Ammons had indeed stolen property from her.

This court finds the testimony of Judy Shanklin to be only partially credible. In making this determination, the court took notice of Ms. Shanklin's demeanor during her testimony. She was somewhat reticent and slightly evasive at times during the hearing. She was unable to recall specific details regarding the search, such as the date, or even the season, that it took place. The court also notes the questionable relationship between Ms. Shanklin and Ammons. Ms. Shanklin and Ammons were engaged in a business relationship evidenced by no formal contract and also lived together for a period of time. The court finds it hard to accept her testimony as that of a disinterested witness, noting that despite Ms. Shanklin's acknowledgment of Ammons' repeated theft from her, she continues to give him money for both his sister and his attorney's fees.

Ms. Shanklin's testimony differs with testimony from the first evidentiary hearing in two major aspects. First, she testified that when she arrived at the Wheatley house the police and her sons were already searching the house. The previous witnesses had testified that she requested for the police to search the house after she arrived. (Report and Recommendation at 4-5, 7, Doc. No. 55, Nov. 5, 2007.) For the following reasons, this court finds as

fact that the relevant warrantless search did not begin until after Ms. Shanklin had arrived at the scene and gave consent: (1) Ms. Shanklin had trouble recalling the day and time of the events that night; (2) both Deputy Walker and Robert Shanklin testified that the police were asked to search the house after Ms. Shanklin arrived; (3) Ms. Shanklin's testimony is only partially credible; and (4) the testimony of the previous witnesses was found to be fully credible.

Second, Ms. Shanklin testified that Billy found the pawn tickets at the Wheatley house and gave them to her the next morning. Previous testimony from Investigator Moody stated that Ms. Shanklin had found the tickets in her bedroom at the Sorrells Chapel house. (Report and Recommendation at 6, Doc. No. 55, Nov. 5, 2007.) It is quite possible that Investigator Moody may have misunderstood how Ms. Shanklin came into possession of the pawn tickets or that Ms. Shanklin may have misstated it to him. Ms. Shanklin gave a detailed account describing how Billy stayed behind to search the Wheatley house after the police left and how he came in the next morning and "slapped" the pawn tickets down in front of her. As a result, this court finds as fact that the pawn tickets were discovered at the 131 Wheatley house by Billy Shanklin after the police, Ammons, and Ms. Shanklin had left the scene. This fact determination does not affect the full credibility given to Investigator Moody's previous testimony.

Other than the two fact issues previously discussed, the testimony of Judy Shanklin did not conflict with or rebut the testimony of any prior witnesses in any material matter. Furthermore, her testimony did not impeach or affect the credibility of any of the previous witnesses. Accordingly, this court finds as fact that the search at the 131 Wheatley Drive house occurred as previously detailed in the initial report and recommendation (Report and Recommendation at 3-12, Doc. No. 55, Nov. 5, 2007.), with the exception that the pawn tickets were discovered by Billy Shanklin, not Judy Shanklin, at the Wheatley house instead of the house on Sorrells Chapel Road.

PROPOSED CONCLUSIONS OF LAW

The instant motion seeks to suppress evidence obtained from the search of the house at 131 Wheatley Drive and evidence obtained as the result of a traffic stop. Ms. Shanklin's testimony only related to the search of the Wheatley house, and it only affects the conclusions of law related to the search of the Wheatley house from the initial report and recommendation (Report and Recommendation at 12-26, Doc. No. 55, Nov. 5, 2007.) as discussed below.

A. <u>The Search of the House</u>

1. *Governmental Search v. Private Search*

Nothing in Ms. Shanklin's testimony changes the previous conclusion that the search of the 131 Wheatley house began as a

9

private search but morphed into a governmental search. Based on Ms. Shanklin's testimony, however, the court additionally concludes that the governmental search converted back to a private search when the officers left and Billy Shanklin remained to continue to search with the permission of his mother.

    2.   *Consensual Search*

Ms. Shanklin's testimony confirmed the fact that she did have an ownership interest in the house, thus giving her proper authority to consent to a search. She also testified that Ammons lived in the house, but this does not affect her ability to consent to a search as a common owner with authority. Her common authority is evidenced by the facts that she purchased the home from Ammons and held a warranty deed and a key to the property.

There still remains no dispute that Ms. Shanklin consented to a search of the house. She testified that she actually helped to search the house. Notably, she never testified that she did not consent to a search of the home or ever asked the police to stop searching. The only question involving the consent was the timing of when the consent was given. As previously discussed, this court has discredited Ms. Shanklin's testimony and relied on the fully credible testimony of the police officers and Robert Shanklin that Ms. Shanklin asked the police to search the home. Accordingly, because her consent was voluntary, anything uncovered from the search cannot be suppressed.

3. *The Pawn Tickets*

Ms. Shanklin's testimony established that the pawn tickets were found by Billy at the Wheatley Drive house. This fact does not change the previous conclusion that the pawn tickets are not fruit of the poisonous tree. Ms. Shanklin did not testify that the police directed her or Billy to search for the tickets. In fact, she testified that Billy, who is her son and a non-government agent, found the tickets *after* the police left and brought them to her the next morning. She later delivered the tickets to Investigator Moody. Ms. Shanklin's testimony actually strengthens the previous conclusion that the tickets were the product of a private search because *two* private actors, herself and Billy, established the chain of delivery for the tickets to the police. Neither of them acted at the direction of the government. Accordingly, there is no basis from suppressing the guns discovered as a result of the pawn tickets being turned over to the police.

RECOMMENDATION

For the reasons stated in both this supplement and the initial report and recommendation, it is recommended that Ammons' motion to suppress be denied in its entirety.

    s/Diane K. Vescovo
DIANE K. VESCOVO
UNITED STATES MAGISTRATE JUDGE
DATE: January 17, 2008

NOTICE

ANY OBJECTIONS OR EXCEPTIONS TO THE INITIAL REPORT AND THE SUPPLEMENTAL REPORT MUST BE FILED WITHIN TEN (10) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN TEN (10) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.

ANY PARTY OBJECTING TO THIS REPORT MUST MAKE ARRANGEMENTS FOR A TRANSCRIPT OF THE HEARING TO BE PREPARED.